# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

DONTAVIUS PRATHER

CRIMINAL CASE NO.

3:18-cr-00013-TCB-RGV

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

Defendant Dontavius Prather ("Prather") is charged in a second superseding indictment with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); one count of taking by force, violence, and intimidation United States currency from at least one bank employee, in violation of 18 U.S.C. §§ 2113(a), (d), and 2; and one count of knowingly carrying and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. [Doc. 95].[1]  Prather has filed two motions to suppress evidence resulting from the execution of search warrants, [Docs. 91 & 92], which the government opposes, [Doc. 174].  For the reasons that follow, it is **RECOMMENDED** that both motions to suppress, [Docs. 91 & 92], be **DENIED.**

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

## I.  FACTUAL BACKGROUND

On July 25, 2018, a federal grand jury in the Northern District of Georgia returned an indictment charging Prather and his co-defendants with various offenses in connection with an armed bank robbery that occurred on June 28, 2018, in Woodbury, Georgia, [Doc. 16], during which Prather allegedly drove three gunmen to the bank in a black Chevrolet Impala, [id. at 2].  Subsequent to the bank robbery, the Honorable Justin S. Anand, United States Magistrate Judge, issued search warrants on the same day for geolocation data regarding Prather's cellular telephone and for information from Prather's Facebook account.  [Doc. 91-1; Doc. 93-1; Doc. 174-1].

The affidavits that the government attached to its applications for the search warrants described the relevant probable cause as follows:

6.   On June 28, 2018, at approximately 12:24 p.m., three armed black males with their faces covered robbed the United Bank located at 33 Jones Mill Road, Woodbury, Georgia 30293, which is located in the Northern District of Georgia.  The deposits of United Bank are federally insured through the Federal Deposit Insurance Corporation (FDIC).

7.   Based on bank surveillance footage, the robbers were described as follows:

a.   Subject 1 (later identified as [Derrick Scott ("Scott")] was described as a black male of unknown age, between 5'10" and 6'2" tall with a medium or athletic build, wearing a camouflage long sleeve shirt, a matching balaclava, a pair

of black pants, a pair of white shoes, purple gloves, and a black backpack with orange straps, and carrying a silver handgun;

b.     Subject 2, who remains unidentified,[2] (hereinafter "Unsub 2") was described as a black male of unknown age, between 5'10" and 6'2" tall with a thin build, wearing a camouflage baseball hat, black balaclava, grey long sleeve shirt, faded light blue pants, purple gloves, white with blue toes shoes, and a grey backpack, and carrying a black handgun; and

c.     Subject 3 (later identified as [Antavious Bray ("Bray")] was described as a black male of unknown age, between 5'10" and 6'2" tall with a thin build, wearing a black hooded long sleeve shirt, black face covering, and black pants, and carrying a semi-automatic rifle.

8.     After being dropped off at the bank by a black Chevrolet Impala, [Bray], [Scott], and Unsub 2 ran into the bank. [Scott] and Unsub 2 approached the teller counter pointing guns at the teller while [Bray] went into the offices and ordered two employees face down on the ground. [Scott] and Unsub 2, each of whom was wearing gloves and carrying a backpack, took money from the teller drawers and placed it into their backpacks. [Scott] and Unsub 2 then demanded the vault be opened, took two employees into the vault with them, and placed money from the vault into their backpacks.

9.     The total loss amount reported by the bank was $189,259.00 US Dollars.

10.    [Bray], [Scott], and Unsub 2 fled out the back door of the bank, where they were engaged by a City of Woodbury Police Officer.

---

[2] According to the government, "Subject 2 was subsequently identified as D'Asis Sheffield and indicted in a superseding indictment." [Doc. 174 at 3 n.2 (citing [Docs. 45 & 95])].

The three robbers then fled on foot into the woods northwest of the bank, dropping the semi-automatic rifle, a handgun, and assorted clothing.  These items were collected as evidence.

11.     A black Chevrolet Impala was approaching the bank as the robbers came out the back door.  But after the officer fired at the suspects leaving the bank, the Impala left the area.  It was later determined through interviews that this vehicle was the getaway car for the suspects.

12.     The Impala seen in the bank surveillance video had tinted windows, what appeared to be chrome additions to the front bumper, and "SS" in silver/chrome on the bottom front of the front-passenger door.

13.     In talking with the Chief of Police in Woodbury, Georgia, the Chief of Police in Greenville, Georgia stated that he recently sold a black Chevrolet Impala SS sedan with tinted windows and chrome additions to the front bumper to [] [Prather].  The license plate for this vehicle is Georgia tag RLF8601; VIN Number 2G1WD58C879165734.

14.     A search of publicly available photographs on Facebook showed [Prather] leaning on a black Chevrolet Impala SS that has tinted windows, chrome additions to the front bumper, and "SS" in silver/chrome on the bottom front of the front-passenger door, all of which matches the surveillance video of the vehicle used in the United Bank robbery.

15.     [Scott] and [Bray] were apprehended by law enforcement approximately five hours after the robbery.  During recorded *Mirandized* interviews, [Scott] and [Bray] admitted to being involved in the robbery of the United Bank.  During his interview, [Bray] said the third suspect (Unsub 2) and the driver of the black Chevrolet Impala getaway car are known as "Big D" and "Little D."  [Bray] described the driver as skinny with dreads.  [Bray] and [Scott] both admitted to being in the Bloods gang.

4

16.    According to [Prather]'s driver's license information, he has dreads, is 6 feet tall and weighs 160 pounds, which fits the description given by [Bray] during his interview.

17.    During two separate interviews on July 3 and July 10, 2018, a Confidential Human Source (CHS) told FBI agents that [Prather] was the driver the day of the robbery.

18.    The CHS told Agents in an interview on July 18, 2018 that members of the Bloods gang were attempting to move [Prather] out of the state of Georgia.  The CHS gave names of Bloods members in Atlanta, Georgia, Missouri, and Los Angeles, California who are known to help hide gang members.

19.    A tipster called into United Bank on July 17, 2018, saying [Prather] was involved in the United Bank robbery and was betting 50-dollar bills during games of craps.  There is still $3,000 outstanding from the robbery, which includes serialized 50-dollar bills.

[Doc. 93-1 at 3-6 ¶¶ 6-19]; see also [Doc. 91-1 at 3-6 ¶¶ 5-18].  The Facebook warrant application further stated that "[o]ther co-conspirators had communicated via Facebook messenger about the robbery," that a "public search using the name 'Dontavius Prather' led investigators to the Subject Account," and that "[p]ublicly available pictures on the account suggest that the Subject Account belongs to [Prather]."  [Doc. 93-1 at 6 ¶¶ 20-21].  The geolocation warrant application further stated:

19.    An examination of a cell phone belonging to [Bray] revealed that [Bray]'s phone was in contact with the Subject Telephone on the morning of the robbery.  The Subject Telephone's number was

5

> saved in [Bray]'s phone under the name "Don," which could be
> short for "Dontavius." Running the Subject Telephone's number
> through the Meriwether County Sheriff's Office's database
> suggested that the Subject Telephone belongs to [Prather].

[Doc. 91-1 at 6 ¶ 19].

## II.  DISCUSSION

Prather moves to suppress geolocation data and content from Facebook gathered pursuant to the search warrants, arguing (1) that "the affiant's claims regarding the Impala viewings were false and material to a finding of probable cause," meriting a <u>Franks</u> hearing on this basis, [Doc. 92 at 2 (citation omitted)], and (2) that the two confidential sources referenced in the affidavits were not "shown to be credible and reliable" and "the information supplied by these sources cannot sustain, or even contribute to, a probable cause finding," [<u>id.</u> at 2-3 (citations omitted)].[3] The government responds that "both arguments are meritless because,

---

[3] In his motion to suppress the Facebook content, "Prather objects to the affiant doing the preliminary search that he admitted doing." [Doc. 92 at 4 (citing [Doc. 93-1 at 6 ¶ 21])]. The paragraph that Prather references provides as follows: "A public search using the name 'Dontavius Prather' led investigators to the Subject Account. Publicly available pictures on the account suggest that the Subject Account belongs to [Prather]." [Doc. 93-1 at 6 ¶ 21]. Contrary to Prather's assertion, the viewing of publicly available pictures on his Facebook account was not a warrantless search that violated his rights, nor did it taint the probable cause determination. <u>See</u> <u>United States v. Meregildo</u>, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (citing <u>Katz v. United States</u>, 389 U.S. 347, 351  (1967)) ("When a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment."); <u>see also</u> <u>United States v. Adkinson</u>, Case No. 4:15-cr-00025-TWP-VTW, 2017 WL 1318420, at *5 (S.D. Ind. Apr. 7, 2017), <u>aff'd</u>, 916 F.3d 605 (7th Cir.

among other things, no false statements supported the issuance of the warrants, and the informants' statements were not essential to the finding of probable cause." [Doc. 174 at 1-2].

## A.  Franks Challenge

"A challenge to a search warrant on the grounds of falsity or reckless statements in the supporting affidavit is handled pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)." United States v. Lebowitz, 647 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009), adopted at 1342, aff'd, 676 F.3d 1000 (11th Cir. 2012) (per curiam).  "Under Franks, if an affidavit submitted to a judicial officer in support of a request for a search warrant contains 'a false statement [made] knowingly and intentionally, or with reckless disregard for the truth,' and if, stripped of that false statement, the affidavit does not establish probable cause, 'the search warrant must be voided. . . .'" O'Ferrell v. United States, 253 F.3d 1257, 1267

_____

2019) (per curiam) (rejecting defendant's assertion that "the Government violated his Fourth Amendment rights by obtaining information and messages authored by [him] from his Facebook page without a warrant" since "the information derived from [his] Facebook page for the purpose of making an identification was publically available").  Prather also argues that, even if the Court denies his motion to suppress, the challenged evidence should be excluded under Rule 403 of the Federal Rules of Evidence since the "prejudicial import of this account clearly exceeds the probative value, and creates a danger of unfair prejudice."  [Doc. 92 at 4-5].  At the pretrial conference held on November 29, 2018, the parties acknowledged that the exclusion of evidence under Rule 403 is an issue to be raised with the District Judge via a motion in limine, so it will not be addressed in this Report and Recommendation.

(11th Cir. 2001) (alterations in original) (quoting <u>Franks</u>, 438 U.S. at 155–56).  Thus, to prevail on a <u>Franks</u> challenge, a defendant "must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant."  <u>Id.</u>; <u>see also</u> <u>United States v.</u> <u>Flowers</u>, Case No. 12-80012-Cr-Middlebrooks/Brannon, 2012 WL 12888760, at *4 (S.D. Fla. May 23, 2012), <u>aff'd</u>, 531 F. App'x 975 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted).

    A defendant who brings a <u>Franks</u> motion must make "'a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard for its truth,'" and "'the false statement was necessary to the finding of probable cause,'" <u>United States v. Maharaj</u>, No. 07-80024-CR-CR, 2007 WL 2254559, at *6 (S.D. Fla. Aug 2, 2007), adopted at *1 (quoting <u>Franks</u>, 438 U.S. at 156).  "'The *Franks* standard is a high one.'"  <u>United States v. Nakouzi</u>, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (quoting <u>Rivera v. United States</u>, 928 F.2d 592, 604 (2d Cir. 1991)).  Thus, "'[t]o mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than

8

a mere desire to cross-examine.'"  Id. (alterations in original) (quoting Franks, 438 U.S. at 171); see also Flowers, 2012 WL 12888760, at *4 (quoting Franks, 438 U.S. at 171) ("To merit an evidentiary hearing, Defendant's challenge 'must be supported by more than a mere desire to cross-examine.'").

Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights.  See Franks, 438 U.S. at 171; Maughon v. Bibb Cty., 160 F.3d 658, 660 (11th Cir. 1998) (per curiam); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997).  Moreover, "'[i]nsignificant and immaterial misrepresentation[s] or omissions will not invalidate a warrant.'"  Maharaj, 2007 WL 2254559, at *7 (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)).  Not every fact recited in an affidavit in support of an application for a search warrant must be exactly correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true.  See Franks, 438 U.S. at 165 (explaining that "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily").

The defendant also bears the burden of showing that, absent the alleged misrepresentations or omissions, probable cause would have been lacking.  See Maharaj, 2007 WL 2254559, at *6 (citing United States v. Novaton, 271 F.3d 968, 987

(11th Cir. 2001)).  Upon such proof by the defendant, the Court must suppress the items seized pursuant to the defective search warrant.  See United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987) (per curiam); United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986).  However, "if the court is satisfied that when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required."  Nakouzi, 2005 WL 3211208, at *5 (internal citation and marks omitted).

Prather challenges a single paragraph contained in both affidavits, [Doc. 91 at 2; Doc. 92 at 2], which states, "The Impala seen in the bank surveillance video had tinted windows, what appeared to be chrome additions to the front bumper, and 'SS' in silver/chrome on the bottom front of the front-passenger door," [Doc. 91-1 at 5 ¶ 11; Doc. 93-1 at 5 ¶ 12].[4]  In particular, Prather asserts that there is no depiction

---

[4] Prather initially also challenged an additional paragraph in both affidavits, [Doc. 91 at 2; Doc. 92 at 2], which provides: "A search of publicly available photographs on Facebook showed [Prather] leaning on a black Chevrolet Impala SS that has tinted windows, chrome additions to the front bumper, and 'SS' in silver/chrome on the bottom front of the front-passenger door, all of which matches the surveillance video of the vehicle used in the United Bank robbery," [Doc. 91-1 at 5 ¶ 13; Doc. 93-1 at 5 ¶ 14].  In particular, Prather asserts that his "counsel [] searched all Facebook records and [did] not see anything remotely resembling anyone leaning against a car, nor any depiction there . . . showing the purported 'SS' symbol." [Doc. 92 at 2].  However, at the November 29, 2018, pretrial conference, the government asserted that these photographs were originally on Facebook and that copies of these publicly available photographs were provided to Prather, see [Doc.

within the bank surveillance video showing the purported SS symbol and argues, on this basis, that "the affiant's claims regarding the Impala viewings were false and material to a finding of probable cause." [Doc. 92 at 2 (citation omitted)]. The government responds that "Prather has offered no proof that the affiant deliberately or recklessly provided false information in the affidavit" and "failed to make the required substantial showing that the affiant's statement was anything more than an innocent mistake or negligent characterization of what appeared in the video." [Doc. 174 at 9]. The Court agrees.

As the Court noted at the November 29, 2018, pretrial conference, Prather has not made a sufficient showing to merit an evidentiary hearing under <u>Franks</u>. Prather simply asserts in his motion to suppress that the information in the affidavit is "false," [Doc. 92 at 2], but he "fails to offer any proof or other independent evidence that the affiant acted from bad motive or recklessly in conducting his investigation and preparing the affidavit[s]," <u>Flowers</u>, 2012 WL 12888760, at *4. While Prather's counsel asserted at the November 29, 2018, pretrial conference that the affiant's statement was recklessly made, this "contention[] that the affiant's

---

116; Doc. 174 at 8-9; Doc. 174-2; Doc. 174-3], but subsequently had been removed, and Prather's counsel clarified that he was not going to contest that the photographs were originally on Facebook, but would maintain his challenge to the affiant's description of the vehicle as not matching what he viewed on the bank surveillance video. Thus, the Court will only address his challenge as to the bank surveillance video.

[statement was] . . . recklessly made [is] purely conclusory." Id. Thus, the Court finds that Prather has "fail[ed] to make the requisite preliminary showing which would necessi[t]ate a Franks hearing, much less set forth a convincing Franks challenge."[5] Id.; see also United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006) (per curiam) (holding that defendant "failed to make the necessary 'substantial preliminary showing'"); United States v. Martin, CR. NO. 1:17-cr-486-WKW-SRW, 2017 WL 6762471, at *2 (M.D. Ala. Dec. 15, 2017), adopted by 2017 WL 6757579, at *1 (M.D. Ala. Dec. 29, 2017) (footnote omitted) (finding that "even if defendant did proffer evidence concerning this T-shirt, he made no offer of proof that the affiant *deliberately or recklessly* included a false statement . . . in the warrant affidavit"); United States v. Howard, No. 13-20437-CR, 2013 WL 6919725, at *2 (S.D. Fla. Oct. 22, 2013), adopted by 2013 WL 6918042, at *1 (S.D. Fla. Nov. 22, 2013) (finding that "defendant [] failed to establish his entitlement to a *Franks* hearing" since "[n]othing support[ed] a finding that the affidavit for the search warrant in this ca[]se contained deliberate falsehoods or a reckless disregard for the truth"); Lebowitz, 647 F. Supp.

---

[5] As the government points out, the "Impala in the video has tinted windows and what appear to be chrome additions to the front bumper, along with a silver symbol on the lower front of the front-passenger door in the exact same place that the silver 'SS' can be seen on [] Prather's car," [Doc. 174 at 9 (citation omitted)], and "[w]hile the 'SS' may not be entirely legible in the video footage, this does not render the affiant's opinion that it appears to be an 'SS' false," [id.]. Indeed, it appears to be a reasonable inference from the available evidence, not a reckless representation. See [Docs. 174-2 through 174-8].

2d at 1348 ("Defendant Lebowitz's claim . . . is pure speculation made without any offer of proof and fails the second element of the *Franks*' test, that is, proof that the officer's actions were reckless or deliberate.").[6] Accordingly, it is **RECOMMENDED** that Prather's motions requesting a <u>Franks</u> hearing and suppression of evidence based on false statements in the affidavit be **DENIED**.

B. **Probable Cause**

Prather also asserts that the affidavits failed to provide any indicia of the reliability of the confidential sources of information referenced therein and did not support the probable cause determination. [Doc. 92 at 2-3]. The government responds that the informants' statements are reliable, but even assuming for the purposes of Prather's motions that they are unreliable, they are not essential to the finding of probable cause. [Doc. 174 at 10-14].

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance

---

[6] Moreover, for the reasons discussed hereinafter, Prather also has failed to show that "striking the allegedly false information . . . would have negated the finding of probable cause." <u>Lebowitz</u>, 647 F. Supp. 2d at 1348 (citations omitted). Disregarding the assertion that the SS symbol on the vehicle was visible on the bank surveillance video, there remained ample evidence establishing probable cause to support issuance of the warrants.

between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions. In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference. In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994). "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted). That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted). "Probable cause deals 'with probabilities [which are] . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar

14

v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No.

15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015), aff'd, 649 F. App'x 714 (11th

Cir. 2016) (per curiam) (unpublished) (citation omitted).

"Courts reviewing the legitimacy of search warrants should not interpret

supporting affidavits in a hypertechnical manner." Miller, 24 F.3d at 1361 (citation

omitted). "Rather, a magistrate should make 'a practical, common-sense decision

whether, given all the circumstances set forth in the affidavit before him, including

the 'veracity' and 'basis of knowledge' of persons supplying hearsay information,

there is a fair probability that contraband or evidence of a crime will be found in a

particular place.'" United States v. Harden, CRIMINAL ACTION FILE NO.

1:16-CR-297-MHC-JSA, 2017 WL 517818, at *3 (N.D. Ga. Feb. 8, 2017) (quoting Gates,

462 U.S. at 238).

Prather asserts that the affidavits "reference[] purported statements of two

confidential sources as supporting probable cause." [Doc. 92 at 2 (citation omitted)].

The paragraphs to which Prather is referring provide:

> 17. During two separate interviews on July 3 and July 10, 2018, a Confidential Human Source (CHS) told FBI agents that [Prather] was the driver the day of the robbery.

> 18. The CHS told Agents in an interview on July 18, 2018 that members of the Bloods gang were attempting to move [Prather] out of the state of Georgia.  The CHS gave names of Bloods

members in Atlanta, Georgia, Missouri, and Los Angeles,
California who are known to help hide gang members.

19.     A tipster called into United Bank on July 17, 2018, saying
[Prather] was involved in the United Bank robbery and was
betting 50-dollar bills during games of craps.  There is still $3,000
outstanding from the robbery, which includes serialized
50-dollar bills.

[Doc. 93-1 at 6 ¶¶ 17-19]; see also [Doc. 91-1 at 5-6 ¶¶ 16-18].  Prather contends that

neither source "was shown to be credible and reliable" and that the "affiant made

no statement of basis of knowledge and reliability as to either source," and as such,

they cannot support probable cause.  [Doc. 92 at 2-3].

While the information in the affidavits regarding the confidential sources is

sparse, see [Docs. 91-1 & 93-1], "the confidential informant information was [not] the

only information in the affidavits," United States v. Green, CR. NO. 1:16cr131-WKW,

2018 WL 3451580, at *7 (M.D. Ala. Apr. 30, 2018), adopted by 2018 WL 3448224, at

*1 (M.D. Ala. July 17, 2018).  In fact, Prather's argument "ignore[s] the multitude of

other facts contained in the affidavits that establish probable cause for the issuances

of the search warrants."  Id.  As the government points out, the affidavits show that

"an armed bank robbery occurred and that the gunmen were dropped off at the

bank by a black Chevrolet Impala," that "the black Chevrolet Impala was the

intended getaway car," that "bank surveillance video from the time of the robbery

shows a black Impala with tinted windows and distinctive chrome bumper

16

additions," that "the chief of police in a neighboring town sold a black Chevrolet Impala SS with tinted windows and chrome additions to the front bumper to [] Prather," that "publicly available Facebook photographs [] show [] Prather leaning on a black Chevrolet Impala SS sedan with the same distinctive chrome additions to the front bumper," and that "Prather's name and physical description are consistent with how one of the gunmen described the getaway driver."  [Doc. 174 at 13-14]; see also [Doc. 91-1 at 3-5 ¶¶ 5-15; Doc. 93-1 at 3-6 ¶¶ 6-16].  The Facebook warrant application further stated that "[o]ther co-conspirators [had] communicated via Facebook messenger about the robbery,"[7] that a "public search using the name

---

[7] In the section challenging the reliability of the confidential informants, Prather contends that the "fact that other co-conspirators may have communicated on Facebook about the robbery, without the Affidavit's making reference to those individuals implicating Prather specifically, has, of course, no determination on the probable cause as to Prather's culpability or need to view his Facebook records" as there were "[n]o details whatsoever [] made about these purported communications occurring within [this paragraph], or how they pertained to Prather, if at all."  [Doc. 92 at 3 (internal citation omitted)].  The Court, however, disagrees.  "By the time the FBI applied for the Facebook warrant[], it had collected a wealth of evidence, which was set out in the affidavit[] supporting the warrant[], showing that [Prather] was part of the [armed robbery] conspiracy."  United States v. Blake, 868 F.3d 960, 973 (11th Cir. 2017); see also [Doc. 93-1].  In addition, the investigation revealed that Prather had a Facebook account, and his co-conspirators had used Facebook messenger to communicate about the robbery, [Doc. 93-1 at 6 ¶¶ 20-21], and the affiant attested, based on his training and experience, that it was "common for individuals who use multiple social media platforms, such as Facebook, to utilize the private messaging feature to communicate with others" and it was "common for individuals engaged in criminal activity to communicate via Facebook and utilize the private message feature as an alternative to the use of cellular telephone texting services as an effort to thwart detection by law enforcement," [id. at 12 ¶ 42].  "Thus,

'Dontavius Prather' led investigators to the Subject Account," and that "[p]ublicly available pictures on the account suggest that the Subject Account belongs to [Prather]."  [Doc. 93-1 at 6 ¶¶ 20-21].  The geolocation warrant application further stated that an "examination of a cell phone belonging to [Bray] revealed that [Bray]'s phone was in contact with the Subject Telephone on the morning of the robbery," that the "Subject Telephone's number was saved in [Bray]'s phone under the name 'Don,' which could be short for 'Dontavius,'" and that "[r]unning the Subject Telephone's number through the Meriwether County Sheriff's Office's database suggested that the Subject Telephone belongs to [Prather]."  [Doc. 91-1 at 6 ¶ 19].

---

as a matter of common sense, it stands to reason that [Prather's] Facebook account would contain evidence highly relevant to the robber[y]."  United States v. Pendergrass, CRIMINAL ACTION FILE NO. 1:17-CR-315-LMM-JKL, 2018 WL 7283631, at *18 (N.D. Ga. Sept. 11, 2018), adopted by 2019 WL 102377, at *1 (N.D. Ga. Jan. 4, 2019) (citation omitted) (disagreeing with defendant's argument that the warrant failed to establish probable cause that evidence of a crime would be found on defendant's Facebook account since "there [was] no information suggesting that he was using . . . Facebook in connection with the armed robberies" because the affidavit stated that defendant used Facebook to communicate and the agent "stated that based on that information he believed that [defendant] likely communicated with [his co-conspirator] and other co-conspirators using Facebook 'to discuss the planning, execution, and concealment of their crimes'").  But see United States v. Propps, Case No. 4:18-cr-00003, 2019 WL 668465, at *3 (N.D. Ga. Feb. 19, 2019) (finding that the affidavit did not establish probable cause to conclude law enforcement would find evidence of a crime on defendant's Facebook account where the affidavit alleged "that Ghostface Gangster members used their Facebook accounts to further the goals of the gang, posting photos or communications that might evidence criminal activity," but did "not allege that all gang members do this or that Defendant [] used his Facebook account for such purposes").

"When considered in a practical and common sense way, the statements in the affidavit[s], excluding those from the confidential informant[s], clearly establish probable cause," Danner v. United States, No. 5:12–cv–08041–VEH–JHE, No. 5:07-cr-370-VEH-RRA, 2015 WL 251307, at *8 (N.D. Ala. Jan. 20, 2015), adopted at *1; see also Green, 2018 WL 3451580, at *7 (Even "disregard[ing] the information provided by the confidential informants, there are sufficient facts in the affidavits to support a finding of probable cause); United States v. Cruz, No. 1:14-cr-00070, 2015 WL 5311409, at *6 (M.D. Pa. Sept. 11, 2015) (finding "Magistrate Judge [] would have had a substantial basis for finding probable cause even absent confidential informant 2's statement"), in that the affidavits set forth facts sufficient to show a fair probability that evidence of the armed bank robbery would be found in the geolocation data of Prather's phone, in addition to his Facebook account, see Pendergrass, 2018 WL 7283631, at *18 (finding affidavit supplied probable cause to search defendant's Facebook account for evidence of robberies); United States v. Najera-Perez, [Criminal] Action No. 1:12-CR-232-2-CAP, 2014 WL 888651, at *10 (N.D. Ga. Mar. 6, 2014), adopted at *1 (concluding that "[a]ffidavits supplied by the Government present[ed] ample probable cause that geolocation data from the target telephones would yield evidence of criminal activity"). Accordingly, for all of the

foregoing reasons, it is **RECOMMENDED** that Prather's motions to suppress evidence, [Docs. 91 & 92], be **DENIED**.

## III.   CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Prather's motions to suppress evidence resulting from execution of search warrants, [Docs. 91 & 92], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 11th day of July, 2019.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE